IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 25, 2019

**MICHAEL WADDELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**

No. 09-07520    Chris Craft, Judge

_____

**No. W2018-01853-CCA-R3-PC**

_____

The Petitioner, Michael Waddell, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction of second degree murder and the accompanying thirty-seven-year sentence, contending that the post-conviction court erred by holding that he received effective assistance of counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Constance Wooden Alexander, Memphis, Tennessee, for the Appellant, Michael Waddell.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In 2012, a Shelby County jury convicted the Petitioner of second degree murder. The trial court sentenced the Petitioner as a Range II, multiple offender to thirty-seven years in confinement. On direct appeal, this court affirmed the Petitioner's conviction and sentence. See State v. Michael Waddell, No. W2012-01910-CCA-R3-CD, 2013 WL

6706088, at *1 (Tenn. Crim. App. at Jackson, Dec. 18, 2013). This court set out the pertinent facts adduced at trial as follows:

>   The [Petitioner's] conviction resulted from the death of Shayla Harris, who was the victim of a shooting by the [Petitioner]. At trial, Clarence Scott, IV, testified that he lived at 2753 Browning Street, near Joslyn Clemmons, who was the victim's aunt. Scott had known the [Petitioner] for several years and had bought drugs from him. Before dark on the evening of June 30, 2009, Scott was in his house smoking crack cocaine with some friends when the [Petitioner] and the [Petitioner's] brother, Felt, came to the house. The [Petitioner] told Scott "'can't nobody else sell drugs on the street.'" Felt demanded that Scott pay him, then he and the [Petitioner] told Scott to leave the house and get the money. Because both men had pistols, Scott left the house. He saw the victim and her boyfriend, Aubrey Lynn Taylor, sitting in a car in the driveway.
>
>   Scott said that he went to his parents' house next door and stood in front of the residence. After the [Petitioner] and Felt left, Scott returned to his house. The victim and Taylor were still in the driveway. Three to five minutes later, Scott heard the victim and Taylor start their car and drive away. Approximately five minutes later, Scott heard a gunshot. He looked out his front door but did not see who had been shot. However, he saw Taylor "jumping and hollering" and saw the [Petitioner] running away. Shortly thereafter, the police arrived and secured the scene.
>
>   On cross-examination, Scott said that he used, but did not sell, drugs. Scott acknowledged that on the day of the shooting he had smoked crack cocaine for at least six to eight hours, but he maintained that he "wasn't that cloudy."
>
>   Scott said that he knew the victim had been shot when he saw Taylor "running back and forth shouting 'he shot my baby.'" Scott did not see an altercation between the victim and the [Petitioner].
>
>   Joslyn Clemmons testified that she lived at 2738 Browning Street and that the [Petitioner] lived in a rooming

2

house approximately four houses down the street from her. She described the [Petitioner] as "a violent type guy."

[Ms. Clemmons] said that on June 30, 2009, she saw the [Petitioner] "practically throughout the day ranting and raving, ranting and raving up and down the street . . . [c]ussing and fussing at everyone, anyone." At approximately 3:30 or 4:00 p.m., the victim, who was driving a white, 2003 Chevrolet Malibu, came to visit her. [Ms. Clemmons'] nephew, Antoine; her son, Eric; her three-year-old grandson; and the victim's friend, Penny, were also at the house. [Ms. Clemmons] looked outside and saw the [Petitioner's] brothers, Eric and Felt. The [Petitioner] was standing down the street in the yard of a house that had burned, and a blue, four-door Cadillac was parked in the grass. A woman and two or three children were with the [Petitioner] and his brothers.

[Ms. Clemmons] said that the victim left the house to drive her mother to work and returned thirty or forty-five minutes later. The victim's boyfriend, Taylor, was with her, and they parked in [Ms. Clemmons'] driveway. When they arrived, [Ms. Clemmons] was standing at the front door. The [Petitioner] was wandering the street near [Ms. Clemmons'] driveway, "ranting and raving, waving a gun." [Ms. Clemmons] told the [Petitioner] to get away from her house and that she was going to call the police. When she picked up the telephone to call 911, the [Petitioner] raised his gun. [Ms. Clemmons] said, "[D]on't you do that, Mike." The [Petitioner] disregarded her statement, "raised that gun up and put that gun in [the victim's] face and shot [the victim]." The [Petitioner] said, "'I didn't like that bitch no way.'"

[Ms. Clemmons] said that after the shooting, the [Petitioner], his brother, the woman, and the children got into the Cadillac and drove away, running over curbs and garbage cans. [Ms. Clemmons] did not see Antoine [Clemmons] or the victim have any interaction with the [Petitioner].

On cross-examination, [Ms. Clemmons] said that the shooting occurred at night while it was dark. A streetlight was by the curb across the street, and her next door neighbor had a bright light on a pole at the end of his driveway.

3

[Ms. Clemmons] acknowledged that in her statement to the police, she initially said that she did not see "him" with a gun. She explained that she "was just mad and wanted to get out [of] the police station because I was so mad I wanted to kill him myself." She denied that she would lie in order to mislead the jury.

On redirect examination, [Ms. Clemmons] clarified that when she told the police that she did not see "him" with a gun, she was referring to the [Petitioner's] brother Eric, not the [Petitioner]. After reviewing her statement, she recalled that she told the police she saw the [Petitioner] with a "big gray looking gun, gray, silver/grayish, a fat gun" and that she saw him shoot the victim with that gun.

Antoine Clemmons, the victim's older brother, testified that he arrived at [Ms. Clemmons'] house around 9:00 p.m. so that the victim could drive him to his mother's house. When he arrived at the residence, [Ms. Clemmons], Penny, [Ms. Clemmons'] son, and [Ms. Clemmons'] grandson were in the yard. Gladys Mitchell, a neighbor who lived to the right of [Ms. Clemmons], was on her porch with Bernard Clemmons, Steve Lloyd, and Felt. The [Petitioner] was in Mitchell's yard. [Mr. Clemmons] said that he had no contact with the [Petitioner] at that time.

[Mr. Clemmons] said that approximately thirty-five minutes to one hour later, the victim and Taylor came to [Ms. Clemmons'] house. Taylor was driving the victim's Malibu. When they arrived, [Mr. Clemmons] was sitting on [Ms. Clemmons'] porch with Penny, and [Ms. Clemmons] was standing in the doorway. The victim asked [Ms. Clemmons] if he was ready to leave. He said yes and walked off the porch. When [Mr. Clemmons] reached the end of the driveway, the [Petitioner] approached him, carrying a chrome and black semiautomatic Glock pistol in his hand. The [Petitioner] pushed [Mr. Clemmons] and said, "[W]hat you trying to do to me, you're trying to do something to me, trying to work up on me or something to that sort." [Mr. Clemmons] asked the [Petitioner] what was wrong, told him to "chill," and cautioned the [Petitioner] not to do something he would regret.

4

[Mr. Clemmons] said that as he and the [Petitioner] talked, they walked down the street away from [Ms. Clemmons'] house. When [Mr. Clemmons] arrived at a neighbor's porch "two doors down," he turned around and noticed the [Petitioner] was near the front of [Ms. Clemmons'] yard. A fight "broke out" between the [Petitioner] and the victim, with both individuals "swinging" punches. The [Petitioner] used both hands to strike the victim. [Mr. Clemmons] said that the victim was "throwing blows" at the [Petitioner] to defend herself. During the fight, [Mr. Clemmons] saw the [Petitioner] fire the Glock in the victim's face. [Mr. Clemmons] began running toward the fight, and saw the victim fall to the curb. The [Petitioner] stood in place "like in disbelief," saying nothing. [Mr. Clemmons] grabbed the victim, saw that she was bleeding, but could not tell where she was injured. The [Petitioner] left before the police arrived.

On cross-examination, [Mr. Clemmons] said that he did not know whether the [Petitioner] and the victim were "having words as they [were] fighting." [Mr. Clemmons] acknowledged that he said in his statement to the police:

> "I was sitting on the porch when [the victim and Taylor] approached me and asked if I was ready to go home for the night. The shooter took in content that something was being said to him and it was not. By then I leave the porch and walked out towards the fence and he pushes me."

[Mr. Clemmons] said that he saw the [Petitioner] strike the victim several times in the face with the gun before the [Petitioner] fired the gun. [Mr. Clemmons] told the police that he was not sure if the [Petitioner] "was trying to shoot over [the victim's] head to scare her."

[Mr. Clemmons] stated that he and the [Petitioner] had been close friends prior to this incident. He said that before the victim got out of her car, he heard [Ms. Clemmons] and the [Petitioner] "have words with each other." [Mr. Clemmons] said, "Whatever caused them to be in a physical

5

fight I don't know, but I know [the victim] wouldn't have not proceeded to do anything to him unless done upon."

On redirect examination, [Mr. Clemmons] said that he told the police that the [Petitioner] "'took the pistol and cocked it and swung it at her, then swung it again and pointed it at her face and squeezed the trigger. I don't know if he was trying to shoot over her head but he shot her.'" [Mr. Clemmons] also told the police that the [Petitioner] "'couldn't have been trying to shoot her over the head because he aimed at her face and pulled the trigger and walked off.'" [Mr. Clemmons] said that the [Petitioner] intended to shoot the victim and that the [Petitioner] walked away without saying anything after the shooting.

On recross-examination, [Mr. Clemmons] said that the [Petitioner] and the victim fought for twenty or thirty seconds. He acknowledged that he did not see anything that would have prevented either the victim or the [Petitioner] from retreating.

. . . .

The jury found the [Petitioner] guilty of second-degree murder. The trial court imposed a sentence of thirty-seven years.

Id. at *1-3, 7 (footnotes omitted).

The Petitioner filed a timely petition for post-conviction relief, alleging that he received ineffective assistance of trial counsel. The post-conviction court appointed counsel, and post-conviction counsel filed amended petitions, claiming in pertinent part that trial counsel was ineffective for failing to follow the requirements of Tennessee Rule of Evidence 613 in order to impeach Antoine Clemmons with prior inconsistent statements.

At the post-conviction hearing, trial counsel testified that he had been practicing law for thirty-six years when he was appointed to represent the Petitioner in criminal court. Trial counsel reviewed the indictment and the State's discovery file. He also investigated the case, including interviewing witnesses that the Petitioner had identified. Trial counsel determined that some witnesses would be more helpful to the case than others. One of the witnesses that trial counsel ruled out was the mother of the Petitioner's child, who would testify that the Petitioner "got in the car and she drove him

6

away from the scene and [he] told her he just shot someone." Trial counsel thought her testimony would likely support the State's theory and would be harmful to the Petitioner's case. Trial counsel said that the defense pursued "a theory of voluntary manslaughter, adequate provocation" and that Gladys Mitchell would give the most favorable testimony to support that theory. Trial counsel explained that Ms. Mitchell "would be able to testify that [the victim] got out of the car and ran and jumped on [the Petitioner] from behind and that an altercation ensued. I believe the colloquial expression is that some licks were passed back and forth." Trial counsel also noted that the Petitioner was smaller than the victim by forty-five or fifty pounds and shorter than the victim by three to five inches. Trial counsel thought that if the jury knew of the "size differential, that the woman jumped [the Petitioner] from the back, [it] might be enough to get them to consider adequate provocation."

Trial counsel stated that he recalled Antoine Clemmons "very well." At trial, Mr. Clemmons testified for the State that the Petitioner intentionally shot the victim. During cross-examination, trial counsel did not ask Mr. Clemmons whether he had made any specific statements to anyone else about the shooting, particularly the Petitioner's state of mind. However, during the Petitioner's proof, trial counsel attempted to call Vida Bailey to testify that Mr. Clemmons had told Ms. Bailey that the shooting was accidental. The trial court excluded Ms. Bailey's testimony under Tennessee Rule of Evidence 613 on the grounds that trial counsel had not given Mr. Clemmons the opportunity to explain or deny the allegedly inconsistent statement. Tennessee Rule of Evidence 613(b) provides in pertinent part:

> Extrinsic Evidence of Prior Inconsistent Statement of Witness. – Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. . . .

Trial counsel explained his reasons for not questioning Mr. Clemmons about the prior statement:

> I did not feel the statements were sufficiently inconsistent to be able to call attention to them. These witnesses that the State presented supported the State's version of the facts. None of these witnesses supported an alternate theory of the facts in the sense that they would either deny that my client at the time, [the Petitioner] shot the victim or that he was not present at the scene.

7

Trial counsel's failure to include a Rule 613 issue in his motion for new trial was not disputed. Trial counsel explained that he "did not feel that it was strong evidence in favor of" the Petitioner.

Appellate counsel testified that he was appointed to represent the Petitioner on direct appeal. Appellate counsel acknowledged that trial counsel had attempted to impeach Mr. Clemmons pursuant to Rule 613 but that the trial court had sustained the State's objection to the impeachment evidence. Appellate counsel explained that he did not raise the issue on direct appeal because he "would have been raising post-conviction issues in a direct appeal. And I would have waived my client's right to a post-conviction in the future."

The Petitioner testified about various issues he had with trial counsel and addressed the issue regarding trial counsel's failure to comply with Rule 613(b). The Petitioner said that Vida Bailey and Montrell Garrett were present at trial to testify. However, trial counsel failed to confront Mr. Clemmons with his prior inconsistent statements to Ms. Bailey and Mr. Garrett. The Petitioner said that because trial counsel "failed to do the groundwork," Ms. Bailey's and Mr. Garrett's testimony was "blocked" by the State's successful Rule 613(b) objection. Additionally, appellate counsel visited the Petitioner before preparing the appellate brief. They reviewed the motion for new trial, and appellate counsel told the Petitioner, "'You might as well go on and start on your post.'" The Petitioner said that appellate counsel looked at him like trial counsel "basically didn't put nothing in [the motion for new trial]. . . . He looked at it like [trial counsel] gave him nothing to go off of."

At the post-conviction hearing, Mr. Clemmons, the victim's brother, was asked if he recalled testifying at trial that the Petitioner intentionally shot his sister. Mr. Clemmons responded, "I said that I don't feel it was intentionally, but he did it. That was my statement." Mr. Clemmons explained, "What I'm saying is it wasn't an accident, but to me, I feel like he wasn't trying to do it on purpose. That was my initial statement, same thing." Mr. Clemmons attempted to clarify, stating further, "[I]t was intentional, but to me he didn't mean it. You understand what I'm saying."

Mr. Clemmons acknowledged that he knew Ms. Bailey and Mr. Garrett. He said that he did not recall discussing the murder of the victim with anyone outside of court and that he never told other people the shooting was accidental. He said that prior to trial, he told the police that "the [Petitioner] took a pistol and cocked it and swung it at her, and then pointed it at her face and pulled the trigger. He couldn't have been trying to shoot over her head because he aimed it at her face and then walked off."

Ms. Bailey testified that prior to trial, she was interviewed by the defense's investigator. Ms. Bailey said that a month or so after the shooting, Mr. Clemmons came to her house while the Petitioner's brothers and two of Ms. Bailey's neighbors were there.

8

Ms. Bailey overheard Mr. Clemmons crying and saying that he loved and missed his sister. Mr. Clemmons said that "[h]e felt in his heart that it was an accident."

Mr. Garrett testified that the Petitioner was the father of his sister's child. Mr. Garrett did not speak with the defense's investigator prior to trial, but he did speak with trial counsel. Mr. Garret said that in the summer of 2012, he, Mr. Clemmons, Marcus Dunlap, Mr. Dunlap's son, and the Petitioner's brothers were at Mr. Dunlap's house. Mr. Garrett said that Mr. Clemmons "was like it was all a accident and it's still love and he was hugging both of the [Petitioner's] brothers."

The post-conviction court held that the Petitioner failed to show that he was entitled to relief and denied the petition. The court acknowledged that at trial, Mr. Clemmons was not given an opportunity to explain or deny the statements he made to Ms. Bailey and Mr. Garrett. Nevertheless, the post-conviction court noted that Mr. Clemmons testified at trial that the Petitioner pointed the gun at the victim's face then pulled the trigger; therefore, the court "could not see how it would be possible that Mr. Clemmons could know whether or not the shooting was an accident, because he would have no way of knowing the [P]etitioner's intent at the time he pulled the trigger." The post-conviction court noted that Mr. Clemmons testified on cross-examination that he told the police that the Petitioner "may have only been intending to shoot over the victim's head to scare her, . . . and so this information was already placed before the jury."

On appeal, the Petitioner's sole claim is that trial counsel provided ineffective assistance of counsel when he failed to impeach Mr. Clemmons with prior inconsistent statements he allegedly made to Ms. Bailey and Mr. Garrett.

## II. Analysis

The Petitioner contends that the post-conviction court erred by holding that trial counsel was not ineffective when he failed to impeach Mr. Clemmons with prior inconsistent statements because the failure precluded counsel from calling Ms. Bailey and Mr. Garrett to testify regarding the statements. The State argues that the post-conviction court properly denied the petition. We agree with the State.

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be

9

resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

In the instant case, the post-conviction court noted that Mr. Clemmons, who was

> the older brother of the victim, but also a friend of the [P]etitioner and his brothers, was an extremely ambivalent witness for the State to begin with regarding the intent of the [P]etitioner when he shot the victim, only testifying to what he saw, not what he thought. He was impeached by the [P]etitioner's trial attorney to some extent by his prior statement to the police that he was not sure if the [Petitioner] might have been trying to shoot over the victim's head to scare her.

10

The post-conviction court further noted that in excluding the testimony of Ms. Bailey, the trial court found it was not possible Mr. Clemmons "could know whether or not the shooting was an accident, because he would have no way of knowing the [P]etitioner's intent at the time he pulled the trigger." The post-conviction court stated:

> Everything that Mr. Clemmons saw was thoroughly explored in his direct and cross[-]examination during trial. Any opinion that he might have expressed to the brothers of the [P]etitioner as to the mental state of the [P]etitioner would not have impeached what he saw, and any alleged improper lay opinion he might have expressed, based on pure speculation, to the [P]etitioner's brothers while crying over his sister's death would not have been admissible. Even if this court had allowed this testimony from these two witnesses, it would not have made any difference in the outcome of the [P]etitioner's trial. It would not have impeached any further the testimony of Mr. Clemmons, or any of the other witnesses who were on the scene at the time of the shooting.

The post-conviction court obviously accredited trial counsel's testimony that he did not pursue the issue because he did not think the statements were "strong evidence in favor of" the Petitioner. The post-conviction court found that the evidence against the Petitioner was strong and that several eyewitnesses saw the Petitioner "waiving or threatening those present" before pointing the gun at the victim's face and shooting her. Afterward, the Petitioner stated, "I didn't like that bitch no way." The post-conviction court found that the alleged inconsistent statements would not have impeached Mr. Clemmons' testimony and would not have made any difference in the outcome of the trial; therefore, the Petitioner had failed to establish prejudice. We agree and conclude that the post-conviction court properly denied the petition for post-conviction relief.

### III. Conclusion

Based on the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

11